**UMG RECORDINGS, INC., Sony Music Entertainment Inc., Warner Bros. Records Inc., Arista Records Inc., Atlantic Recordings Corp., BMG Music d/b/a The RCA Records Label, Capitol Records, Inc., Elektra Entertainment Group, Inc., Interscope Records, and Sire Records Group Inc., Plaintiffs,**

v.

**MP3.COM, INC., Defendant.**

**No. 00 Civ. 472(JSR).**

United States District Court, S.D. New York.

May 4, 2000.

Robert A. Goodman, Arnold & Porter, New York City, Hadrian R. Katz, Jule L. Sigall, Helene T. Krasnoff, Washington, DC, Steven B. Fabrizio, Washington, DC, for UMG Recordings, Inc., Sony Music Entertainment Inc., Arista Records Inc., BMG Music.

Katherine B. Forrest, Cravath, Swaine & Moore, New York City, Robert A. Goodman, Arnold & Porter, New York City, Evan R. Chesler, Cravath Swaine &

Moore, New York City, Hadrian R. Katz, Jule L. Sigall, Helene T. Krasnoff, Washington, DC, Steven B. Fabrizio, Washington, DC, for Warner Bros. Records Inc., Atlantic Recording Corp.

Steven Neal and Michael Rhodes of Cooley Godward LLP, San Diego, CA, Michael B. Carlinsky, Jeffrey A. Conciatori, Orrick, Herrington & Sutcliffe, L.L.P., New York City, for MP3.Com, Inc.

## OPINION

RAKOFF, District Judge.

The complex marvels of cyberspatial communication may create difficult legal issues; but not in this case. Defendant's infringement of plaintiffs' copyrights is clear. Accordingly, on April 28, 2000, the Court granted defendant's motion for partial summary judgment holding defendant liable for copyright infringement. This opinion will state the reasons why.

The pertinent facts, either undisputed or, where disputed, taken most favorably to defendant, are as follows:

The technology known as "MP3" permits rapid and efficient conversion of compact disc recordings ("CDs") to computer files easily accessed over the Internet. *See generally Recording Industry Ass'n of America v. Diamond Multimedia Systems Inc.,* 180 F.3d 1072, 1073–74 (9th Cir. 1999). Utilizing this technology, defendant MP3.com, on or around January 12, 2000, launched its "My.MP3.com" service, which is advertised as permitting subscribers to store, customize and listen to the recordings contained on their CDs from any place where they have an Internet connection. To make good on this offer, defendant purchased tens of thousands of popular CDs in which plaintiffs held the copyrights, and, without authorization, copied their recordings onto its computer servers so as to be able to replay the recordings for its subscribers.

Specifically, in order to first access such a recording, a subscriber to MP3.com must either "prove" that he already owns the CD version of the recording by inserting his copy of the commercial CD into his computer CD–Rom drive for a few seconds (the "Beam-it Service") or must purchase the CD from one of defendant's cooperating online retailers (the "instant Listening Service"). Thereafter, however, the subscriber can access via the Internet from a computer anywhere in the world the copy of plaintiffs' recording made by defendant. Thus, although defendant seeks to portray its service as the "functional equivalent" of storing its subscribers' CDs, in actuality defendant is re-playing for the subscribers converted versions of the recordings it copied, without authorization, from plaintiffs' copyrighted CDs. On its face, this makes out a presumptive case of infringement under the Copyright Act of 1976 ("Copyright Act"), 17 U.S.C. § 101 *et seq. See, e.g., Castle Rock Entertainment, Inc. v. Carol Publishing Group, Inc.,* 150 F.3d 132, 137 (2d Cir.1998); *Hasbro Bradley, Inc. v. Sparkle Toys, Inc.,* 780 F.2d 189, 192 (2d Cir.1985).[1]

■ Defendant argues, however, that such copying is protected by the affirmative defense of "fair use." *See* 17 U.S.C. § 107. In analyzing such a defense, the Copyright Act specifies four factors that must be considered: "(1) the purpose and

---

1. Defendant's only challenge to plaintiffs' *prima facie* case of infringement is the suggestion, buried in a footnote in its opposition papers, that its music computer files are not in fact "reproductions" of plaintiffs' copyrighted works within the meaning of the Copyright Act. *See, e.g.,* 17 U.S.C. § 114(b). Specifically, defendant claims that the simulated sounds on MP3–based music files are not physically identical to the sounds on the original CD recordings. *See* Def.'s Consoli-

dated Opp. to Pls.' Motions for Partial Summ.J. at 13–14 n. 9. Defendant concedes, however, that the human ear cannot detect a difference between the two. *Id.* Moreover, defendant admits that a goal of its copying is to create a music file that is sonically as identical to the original CD as possible. *See* Goodman Reply Aff., Robertson Dep., Ex. A, at 85. In such circumstances, some slight, humanly undetectable difference between the original and the copy does not qualify for exclusion from the coverage of the Act.

character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes; (2) the nature of the copyrighted work; (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and (4) the effect of the use upon the potential market for or value of the copyrighted work." *Id.* Other relevant factors may also be considered, since fair use is an "equitable rule of reason" to be applied in light of the overall purposes of the Copyright Act. *Sony Corporation of America v. Universal City Studios, Inc.,* 464 U.S. 417, 448, 454, 104 S.Ct. 774, 78 L.Ed.2d 574 (1984); *see Harper & Row, Publishers, Inc. v. Nation Enterprises,* 471 U.S. 539, 549, 105 S.Ct. 2218, 85 L.Ed.2d 588 (1985).

██ Regarding the first factor—"the purpose and character of the use"—defendant does not dispute that its purpose is commercial, for while subscribers to My. MP3.com are not currently charged a fee, defendant seeks to attract a sufficiently large subscription base to draw advertising and otherwise make a profit. Consideration of the first factor, however, also involves inquiring into whether the new use essentially repeats the old or whether, instead, it "transforms" it by infusing it with new meaning, new understandings, or the like. *See, e.g., Campbell v. Acuff–Rose Music, Inc.,* 510 U.S. 569, 579, 114 S.Ct. 1164, 127 L.Ed.2d 500 (1994); *Castle Rock,* 150 F.3d at 142; *See also* Pierre N. Leval, "Toward a Fair Use Standard," 103 *Harv. L.Rev.* 1105, 111 (1990). Here, although defendant recites that My.MP3.com provides a transformative "space shift" by which subscribers can enjoy the sound recordings contained on their CDs without lugging around the physical discs themselves, this is simply another way of saying

that the unauthorized copies are being retransmitted in another medium—an insufficient basis for any legitimate claim of transformation, *See, e.g., Infinity Broadcast Corp. v. Kirkwood,* 150 F.3d 104, 108 (2d Cir.1998) (rejecting the fair use defense by operator of a service that retransmitted copyrighted radio broadcasts over telephone lines); *Los Angeles News Serv. v. Reuters Television Int'l Ltd.,* 149 F.3d 987 (9th Cir.1998) (rejecting the fair use defense where television news agencies copied copyrighted news footage and retransmitted it to news organizations), *cert. denied,* 525 U.S. 1141, 119 S.Ct. 1032, 143 L.Ed.2d 41 (1999); *see also American Geophysical Union v. Texaco Inc.,* 60 F.3d 913, 923 (2d Cir.), *cert. dismissed,* 516 U.S. 1005, 116 S.Ct. 592, 133 L.Ed.2d 486 (1995); *Basic Books, Inc. v. Kinko's Graphics Corp.,* 758 F.Supp. 1522, 1530–31 (S.D.N.Y.1991); *see generally* Leval, *supra,* at 1111 (repetition of copyrighted material that "merely repackages or republishes the original" is unlikely to be deemed a fair use).

Here, defendant adds no new "new aesthetics, new insights and understandings" to the original music recordings it copies, *see Castle Rock,* 150 F.3d at 142 (internal quotation marks omitted), but simply repackages those recordings to facilitate their transmission through another medium. While such services may be innovative, they are not transformative.[2]

Regarding the second factor—"the nature of the copyrighted work"—the creative recordings here being copied are "close[ ] to the core of intended copyright protection," *Campbell,* 510 U.S. at 586, 114 S.Ct. 1164, and, conversely, far removed from the more factual or descriptive work more amenable to "fair use," *see Nihon*

---

2. Defendant's reliance on the Ninth Circuit's "reverse engineering" cases, *see Sony Computer Entertainment, Inc. v. Connectix Corp.,* 203 F.3d 596 (9th Cir.2000); *Sega Enterprises Ltd. v. Accolade, Inc.,* 977 F.2d 1510, 1527 (9th Cir.1992), is misplaced, because, among other relevant distinctions, those cases involved the copying of software in order to

develop a new product, *see Sony Computer Entertainment,* 203 F.3d at 606; *Sega Enterprises,* 977 F.2d at 1522, whereas here defendant copied CDs onto its servers not to create any new form of expression but rather to retransmit the same expression in a different medium.

*Keizai Shimbun, Inc. v. Comline Business Data, Inc.,* 166 F.3d 65, 72–73 (2d Cir. 1999); *see also Castle Rock,* 150 F.3d at 143–44.

Regarding the third factor—"the amount and substantiality of the portion [of the copyrighted work] used [by the copier] in relation to the copyrighted work as a whole"—it is undisputed that defendant copies, and replays, the entirety of the copyrighted works here in issue, thus again negating any claim of fair use. *See Infinity Broadcast,* 150 F.3d at 109 ("[T]he more of a copyrighted work that is taken, the less likely the use is to be fair . . . ."); *see generally* Leval, *supra,* at 1122 ("[T]he larger the volume . . . of what is taken, the greater the affront to the interests of the copyright owner, and the less likely that a taking will qualify as a fair use").

Regarding the fourth factor—"the effect of the use upon the potential market for or value of the copyrighted work"—defendant's activities on their face invade plaintiffs' statutory right to license their copyrighted sound recordings to others for reproduction. *See* 17 U.S.C. § 106. Defendant, however, argues that, so far as the derivative market here involves is concerned, plaintiffs have not shown that such licensing is "traditional, reasonable, or likely to be developed." *American Geophysical,* 60 F.3d at 930 & n. 17. Moreover, defendant argues, its activities can only enhance plaintiffs' sales, since subscribers cannot gain access to particular recordings made available by MP3.com unless they have already "purchased" (actually or purportedly), or agreed to purchase, their own CD copies of those recordings.

Such arguments—though dressed in the garb of an expert's "opinion" (that, on inspection, consists almost entirely of speculative and conclusory statements)—are unpersuasive. Any allegedly positive impact of defendant's activities on plaintiffs' prior market in no way frees defendant to usurp a further market that directly derives from reproduction of the plaintiffs' copyrighted works. *See Infinity Broad-*

*cast,* 150 F.3d at 111. This would be so even if the copyrightholder had not yet entered the new market in issue, for a copyrighterholder's "exclusive" rights, derived from the Constitution and the Copyright Act, include the right, within broad limits, to curb the development of such a derivative market by refusing to license a copyrighted work or by doing so only on terms the copyright owner finds acceptable. *See Castle Rock,* 150 F.3d at 145–46; *Salinger v. Random House, Inc.,* 811 F.2d 90, 99 (2d Cir.), *cert. denied,* 484 U.S. 890, 108 S.Ct. 213, 98 L.Ed.2d 177 (1987). Here, moreover, plaintiffs have adduced substantial evidence that they have in fact taken steps to enter that market by entering into various licensing agreements. *See, e.g.,* Forrest R. Aff., Ex. F., Vidich Dep. at 61–63; *id.,* Ex. N; Goodman R. Aff., Ex. B., Silver Dep. at 64–65; *id.,* Ex. D, Eisenberg Dep. at 130–32; *id.;* Ex. E., Evans Dep. 145–48.

Finally, regarding defendant's purported reliance on other factors, *see Campbell,* 510 U.S. at 577, 114 S.Ct. 1164, this essentially reduces to the claim that My. MP3.com provides a useful service to consumers that, in its absence, will be served by "pirates." Copyright, however, is not designed to afford consumer protection or convenience but, rather, to protect the copyrightholders' property interests. Moreover, as a practical matter, plaintiffs have indicated no objection in principle to licensing their recordings to companies like MP3.com; they simply want to make sure they get the remuneration the law reserves for them as holders of copyrights on creative works. Stripped to its essence, defendant's "consumer protection" argument amounts to nothing more than a bald claim that defendant should be able to misappropriate plaintiffs' property simply because there is a consumer demand for it. This hardly appeals to the conscience of equity.

■ In sum, on any view, defendant's "fair use" defense is indefensible and must be denied as a matter of law. Defendant's

other affirmative defenses, such as copyright misuse, abandonment, unclean hands, and estoppel, are essentially frivolous and may be disposed of briefly. While defendant contends, under the rubric of copyright misuse, that plaintiffs are misusing their "dominant market position to selectively prosecute only certain online music technology companies," Def.'s Consolidated Opp. to Pls.' Motions for Summ.J. at 21, the admissible evidence of records shows only that plaintiffs have reasonably exercised their right to determine which infringers to pursue, and in which order to pursue them, *cf. Broadcast Music, Inc. v. Peppermint Club, Inc.,* 1985 WL 6141, at *4 (N.D.Ohio Dec.16, 1985). The abandonment defense must also fall since defendant has failed to adduce any competent evidence of an overt act indicating that plaintiffs, who filed suit against MP3.com shortly after MP3.com launched its infringing My.MP3.com service, intentionally abandoned their copyrights. *See Richard Feiner & Co., Inc. v. H.R. Indus., Inc.,* 10 F.Supp.2d 310, 313 (S.D.N.Y.1998). Similarly, defendant's estoppel defense must be rejected because defendant has failed to provide any competent evidence that it relied on any action by plaintiffs with respect to defendant's My.MP3.com service. Finally, the Court must reject defendant's unclean hands defense given defendant's failure to come forth with any admissible evidence showing bad faith or misconduct on the part of plaintiffs. *See generally Dunlop–McCullen v. Local 1–S, AFL–CIO–CLC,* 149 F.3d 85, 90 (2d Cir.1998); *A.H. Emery Co. v. Marcan Prods. Corp.,* 389 F.2d 11, 18 n. 4 (2d Cir.), *cert. denied,* 393 U.S. 835, 89 S.Ct. 109, 21 L.Ed.2d 106 (1968).[3]

The Court has also considered defendant's other points and arguments and finds them sufficiently without merit as not to warrant any further comment.

**3.** The Court also finds no reason to alter or postpone its determination simply because of the recent filing of the complaint in *Lester Chambers et al. v. Time Warner, Inc., et al.,* 00 Civ. 2839 (S.D.N.Y. filed Apr. 12, 2000) (JSR), the allegations of which, according to the

Accordingly, the Court, for the foregoing reasons, has determined that plaintiffs are entitled to partial summary judgment holding defendant to have infringed plaintiffs' copyrights.

defendant here, call into question the exclusivity of plaintiffs' copyrights. The allegations of a complaint, having no evidentiary value, cannot defeat a motion for summary judgment.